DENNIS K. BURKE
United States Attorney
District of Arizona

JENNIFER LEVINSON
Assistant United States Attorney
Arizona State Bar Number 020551
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Facsimile: (602) 514-7537
jennifer.levinson@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>   v.<br><br>$16,399.00 in United States Currency; and $15,070.00 in United States Currency,<br><br>            Defendants. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff, United States of America, through its attorneys, DENNIS K. BURKE, United States Attorney for the District of Arizona and Jennifer Levinson, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

**NATURE OF THE ACTION**

1. This is an action to forfeit property to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6).

**THE DEFENDANTS IN REM**

2. The defendants consist of the following property: $16,399.00 in United States currency seized from Michael Dudley and $15,070.00 in United States currency seized from

1

Demondre Rogers on June 5, 2009 at Sky Harbor International Airport in Phoenix, Arizona. The defendant currency is currently in the custody of the United States Marshals Service.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court will have *in rem* jurisdiction over the defendants upon the Court's issuance of an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), and the execution of said arrest warrant on the defendants pursuant to Supplemental Rule G(3)(c).

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b), because the defendant currency was found in this district.

## BASIS FOR THE FORFEITURE

6. The defendant currency is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to a violation of 21 U.S.C. §§ 841(a)(1) and/or 846, which are offenses constituting "specified unlawful activity" under 18 U.S.C. § 1596(c)(7), or a conspiracy to commit such offenses.

7. The defendant currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, is proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*

## FACTS

**Background Information**

8. Indiana is an active drug transportation and distribution area and is known as a demand-area for drugs.

9. Seven interstate highway systems and twenty United States highways provide

2

interstate and intrastate links for drug trafficking between Indiana, the southwest border and California.

10. The primary means of drug importation into Indiana are highway and airline trafficking.

11. Once transported to Indiana, illicit drugs are then distributed throughout the Midwest.

12. Ontario, California is in close proximity to Los Angeles, as well as San Diego and Imperial Counties.

13. San Diego and Imperial Counties are principal transshipment zones for a variety of drugs such as cocaine, heroin, marijuana and methamphetamine smuggled from Mexico.

14. Los Angeles is a distribution center for all types of illicit drugs destined for other major metropolitan areas throughout the United States.

15. California is also especially well-known as a supply-area for marijuana.

16. Potent domestic marijuana is cultivated in sophisticated indoor hydroponic gardens throughout California.

17. The growing pervasiveness of domestically grown marijuana has been facilitated by numerous medicinal marijuana clubs and hydroponic shops in California.

**Ticket and Arrival**

18. On June 5, 2009, the Phoenix Police Department Commercial Narcotics Interdiction Unit ("CNIU") at Phoenix Sky Harbor International Airport received information regarding arriving passengers Michael Dudley ("Dudley") and Demondre Rogers ("Rogers").

19. Dudley and Rogers were traveling from Indianapolis, Indiana to Ontario, California with connecting flights in Charlotte, North Carolina and Phoenix, Arizona.

20. Both airline tickets were purchased with a credit card within twenty-four hours of the flight.

21. They were both one-way tickets.

1   22.   Dudley did not check-in any bags for the flight.

2   23.   Rogers checked-in one bag for the flight.

3   24.   Phoenix Police Department Detectives Charles Blalock ("Detective Blalock") and Mike Oolman ("Detective Oolman") watched as Dudley and Rogers' flight into Phoenix arrived and the passengers began to exit the jetway.

6   25.   Having been made aware that Dudley was seated in the 28th row and Rogers was seated in the 30th row, the Detectives waited until individuals from those rows would logically be exiting the jetway.

9   26.   Detective Blalock contacted a passenger exiting the jetway who advised that she was seated in the 26th row.

11  27.   Shortly after, he saw a passenger, later identified as Dudley, exit the jetway.

13  28.   Dudley walked slowly from the jetway in the direction of the concourse exit.

14  29.   A passenger, later identified as Rogers, subsequently exited the aircraft.

15  30.   Dudley was seen walking back toward the gate from which he arrived where he and Rogers greeted each other.

17  31.   They then walked together toward the concourse exit.

18  32.   Bulges were visible in Dudley's pant pockets.

19  33.   The bulges were similar in size and shape to folded United States currency.

**Dudley**

**Initial Contact**

22  34.   Detective Blalock approached the subject later identified as Dudley and identified himself as a Phoenix Police Detective.

24  35.   Detective Blalock asked to see Dudley's ticket.

25  36.   Detective Blalock asked if he was Michael Dudley and Dudley confirmed that he was.

4

| | | |
|---|---|---|
| 1 | 37. | Detective Blalock returned the ticket. |
| 2 | 38. | Detective Blalock then asked for Dudley's identification. |
| 3 | 39. | Dudley provided Detective Blalock with an expired Indiana driver's license. |
| 4 | 40. | After viewing the driver's license, Detective Blalock returned it to Dudley. |
| 5 | 41. | When asked, Dudley stated that he made his flight plans within the last twenty-four hours. |
| 7 | 42. | Dudley identified Rogers as his "buddy." |
| 8 | 43. | When asked, Dudley stated that he did not have any drugs or contraband with him. |
| 9 | 44. | He did say that he had "some money" in his possession. |
| 10 | 45. | Dudley stated that he had approximately $12,000.00 on him. |
| 11 | 46. | Dudley told detectives that the money was for him to use to, "hang out and have a good time." |
| 13 | 47. | He indicated that all the money was in his pants pockets. |
| 14 | 48. | He said that there was no money in the carry-on suitcase that he had in his possession. |
| 16 | 49. | Dudley gave Detective Blalock permission to search the suitcase and no currency or other contraband was located inside. |
| 18 | 50. | Dudley stated that he was on his way to California for a couple of days, but might stay longer. |
| 20 | 51. | He indicated that he and Rogers were going to California to "party." |
| 21 | 52. | Dudley told detectives that all the money he was carrying in his pockets belonged to him. |
| 23 | 53. | He said that he was not carrying any currency for anybody else. |
| 24 | 54. | Detectives asked Dudley where the money was located. |
| 25 | 55. | Dudley tapped the right front pocket of his pants. |
| 26 | 56. | Detectives asked Dudley to see the currency. |

5

57. Dudley removed a stack of United States currency from his pocket.

58. The currency was folded and banded together with black rubber bands.

59 Dudley stated that he had taken some of the currency out of the bank, "but not necessarily all of it, I mean all at once."

60. On this occasion, when asked if the amount of currency he was carrying was $12,000.00, Dudley stated that he was not sure how much money he had in his possession.

61. Dudley said that he had taken approximately $19,000.00 to $20,000.00 out of his bank account in the last couple of months.

62. When asked if the money from his right front pants pocket was all the money he had in his possession, Dudley stated that he had more money in another pocket.

63. Dudley then removed another stack of currency from his left front pants pocket.

64. Dudley consented to a search of his remaining pockets.

65. Additional currency was found in the left rear pocket of his pants.

66. Dudley indicated that this was a couple hundred dollars.

67. After a full count of the currency, it was determined that Dudley was carrying a total of $16,399.00.

68. When asked whether the money in his possession was in close proximity to any illicit drugs, Dudley appeared hesitant in answering.

69. When Detective Blalock asked him whether his answer was yes or no, Dudley replied that it was no.

**Income/Occupation**

70. Dudley said that he owns two businesses in Indianapolis.

71. He indicated that both businesses were incorporated.

72. He also stated that he runs both businesses out of his home.

73. Dudley told the Detectives that one of the companies he owned was an investment company named Reel Investments.

74. He said he was the primary owner of Reel Investments.

75. Dudley told detectives that he had been involved in the real estate business for approximately one year.

6

76. Dudley admitted that he is not a realtor.

77. He said that he buys and sells homes.

78. Dudley later claimed that he has owned Reel Investments for approximately four years.

79. He said that he has made hundreds of thousands of dollars through that business.

80. He also indicated that he is currently sitting on a couple of houses that he has not been able to sell due to the poor real estate market.

81. Upon searching its records for Reel Investments, the Indiana Secretary of State indicated that the closest entity was "Reel Investors, LLC," with a listed owner/registered agent of James E. Oswalt.

82. Dudley stated that his other company is Dudley Development Corporation.

83. Dudley said that he has owned Dudley Development Corporation for about a year.

84. He described Dudley Development Corporation as a business involved in investment-type consultation.

85. He admitted that he is not a stock broker.

86. He also said that he does not monitor the stock market.

87. Dudley told detectives that Darrin Marion ("Marion") was his business partner at Dudley Development Corporation.

88. He indicated that Marion is a stock broker.

89. Marion is not registered as a stock broker with the Financial Industry Regulatory Authority or the Securities and Exchange Commission.

90. Records reveal that Dudley Development Corporation is an Indiana Corporation established on March 5, 2008.

91. Dudley Development Corporation does not have a website.

92. Dudley could not tell detectives how much income was listed on his taxes for the previous year.

93. He said he had a Certified Public Accountant ("CPA") who handles his taxes.

94. Dudley said that his CPA would know the exact amount of money that his businesses brought in last year and how much he paid in taxes.

95. He did not know the name or phone number of his CPA.

96. He did not know Darrin Marion's phone number.

97. He claimed that all of his numbers were stored on his business phone which he did not have with him.

98. Dudley stated that in the prior year, Dudley Development Corporation earned somewhere between $30,000.00 and $40,000.00.

99. Dudley also claimed that Reel Investments earned approximately $66,000.00 in the previous year.

100. He said he lives off of this money.

101. He lives with a girlfriend and his five kids.

102. Dudley did not have any business cards for either of his businesses.

103. Dudley could not tell detectives whether there was a business greeting on his business phone.

104. One of the detectives called the business cell phone number given to him by Dudley.

105. The tone indicated that the number was answered by a facsimile machine.

106. A nation-wide search of each state's (excluding Hawaii) Department of Economic Security revealed no reported income for Dudley for at least the past two years.

107. Dudley stated that Rogers does some odd jobs for him from time to time, but is not employed by him.

108. Dudley said that Rogers was in the air conditioning business.

**Currency**

109. When Detective Blalock advised Dudley that a narcotics canine would inspect the money, Dudley indicated that he occasionally smokes marijuana.

110. He said that he last smoked marijuana the previous Friday and the money was in his house at the time.

111. When detectives questioned Dudley about the currency that was found on Rogers, Dudley stated that he gave Rogers approximately $6,000.00 or $7,000.00 prior to their flight from Indiana that morning.

112. Dudley gave him the money because he did not believe that Rogers had any money to, "hang out and have fun."

113. Dudley stated that he did not give the money to Rogers just to carry for him.

114. Dudley said that he gave the money to Rogers for Rogers' personal use while they were in California.

115. Dudley then told detectives that he had taken $19,000.00 out of his bank account two weeks prior to this incident.

116. Dudley claimed that the money he gave to Rogers was a portion of the $19,000.00 that Dudley had withdrawn from his bank approximately two weeks prior to this incident.

117. Dudley said that he had not made any bank withdrawals since then.

118. He indicated that all the money in his possession, as well as the money he gave Rogers, was from that $19,000 withdrawal.

119. Dudley advised that the money was withdrawn from the Regions Bank business account for Reel Investments.

120. Detective Blalock subsequently called Regions Bank.

121. Dudley spoke to the bank representative and provided her with the personal information needed to access the account.

122. Dudley instructed the bank representative to tell the officer everything the detective wanted to know.

123. Dudley again stated that the $19,000 withdrawal was his only withdrawal during the last few weeks.

124. The bank employee revealed the following:

    a. Dudley made a withdrawal of $19,000.00 on April 20, 2009.

    b. April 21, 2009, Dudley made a deposit in the amount of $19,407.00.

9

   c. Dudley made another withdrawal in the amount of $19,000.00 on May 1, 2009.

   d. There had been no other activity on the account since May 1, 2009.

125. 31 U.S.C. § 5313 requires financial institutions to file a Currency Transaction Report (CTR) for each deposit, withdrawal, exchange of currency or other payment in currency of more than $10,000 by, through, or to such financial institutions.

126. No CTRs associated with Dudley were filed during the months of March, April, May or June, 2009.

127. The absence of a CTR indicates that the $19,000.00 withdrawals made by Dudley could not have been cash withdrawals.

128. When Dudley was again asked how much money he gave to Rogers he paused and said he did not know exactly how much.

129. The $16,399.00 seized from Dudley was in the following denominations:

| Number of Bills | Denomination of Bills | Total Amount Per Bill Denomination |
|---|---|---|
| 84 | $100.00 | $8,400.00 |
| 36 | $50.00 | $1,800.00 |
| 305 | $20.00 | $6,100.00 |
| 8 | $10.00 | $80.00 |
| 2 | $5.00 | $10.00 |
| 9 | $1.00 | $9.00 |
| **TOTAL** | | **$16,399.00** |

**Criminal History**

130. When asked about his criminal history, Dudley stated that he had been arrested for carrying a handgun without a license.

131. Dudley also admitted to being arrested for possession of marijuana, "years ago."

132. In fact, Dudley was arrested in Springfield, Missouri on May 20, 2000.

133. He was charged with Distribution, Delivery, Manufacture or Production of a

1  Controlled Substance.
2      134.    Dudley pled guilty to Possession of a Controlled Substance (Marijuana).
3      135.    Dudley was also arrested in Gary, Indiana on January 28, 2004 for Dealing
4  Marijuana.
5      136.    Dudley was arrested in Indiana a third time on June 9, 2004.
6      137.    This arrest occurred after a traffic stop.
7      138.    As the officer followed the vehicle, he could see the driver and passenger
8  fidgeting around the passenger compartment and attempting to place something in the vehicle's
9  center console.
10     139.    Dudley was found in possession of a loaded Smith and Wesson 40 caliber
11 handgun.
12     140.    The gun was found in the left front portion of his waist band.
13     141.    The vehicle he was riding in had a very strong odor of raw marijuana.
14     142.    A plastic baggy containing raw marijuana was located in the vehicle's center
15 console.
16     143.    Dudley was charged with Possession of Marijuana, Dealing in Marijuana and
17 Possession of a Handgun Without a License.
18     144.    He pled guilty to Possession of a Handgun Without a License.
19 **Rogers**
20     145.    Detective Oolman approached Rogers and identified himself as a detective.
21     146.    Detective Oolman asked Rogers for his identification and ticket.
22     147.    Rogers provided his ticket and an Indiana driver's license to Detective Oolman.
23     148.    Detective Oolman viewed both items and returned them to Rogers.
24     149.    When asked whether he was traveling on a one-way ticket, Rogers indicated that
25 he was not and that his return was scheduled for Monday.
26     150.    When Detective Oolman asked to see his itinerary, Rogers stated that Dudley had
27 it.
28

151. When asked if he was carrying any illegal drugs or contraband, Rogers said that he was not.

152. When asked if he was carrying any large amounts of money, he said that he was not.

153. Rogers had a carry-on bag which he gave Detective Oolman permission to search.

154. No items of significance were found.

155. Rogers had also checked one bag with the airline before the flight.

156. When detectives located the checked bag, it was tagged under Dudley's name.

157. Rogers maintained that the bag belonged to him.

158. He said that he and Dudley got to the airport late that morning.

159. He said that the ticket agent put the checked bag under the wrong name.

160. Rogers granted Detective Oolman permission to search his checked bag.

161. No items of significance were found inside.

162. On this occasion, when Rogers was asked if he had any large amounts of cash or drugs in his pockets, he said that he had money.

163. He said that he was carrying a, "couple grand."

164. Rogers gave Detective Oolman permission to search his pockets.

165. Detective Oolman found bundles of currency in each of Rogers' pants pockets.

166. When asked again how much he had, Rogers said it was $2,000.00.

167. After Officer Oolman pointed out that it appeared to be more than $2,000.00, Rogers said that it was $3,000.00.

168. Rogers then indicated that he was not sure of the amount because he did not count it.

169. When Detective Oolman asked Rogers what he did for a living, Rogers said that he was in real estate.

170. He indicated that he, "works on houses."

171. Rogers stated that he did not file taxes for the prior year.

1      172.    Rogers indicated that he makes approximately $20,000.00 per year.

2      173.    When asked if there was any reason there would be drug odor on the money, Rogers said no.

174.    Rogers said that the money was in his possession the entire time.

175.    He said that Dudley gave him the money to go shopping.

176.    Rogers said that the money was his to spend.

177.    Rogers told detectives that Dudley gave him the money a day or two before they left Indiana.

178.    This is inconsistent with Dudley's claim that the money was given to Rogers just before they boarded the aircraft.

179.    Rogers said that Dudley did not tell him how much money it was.

180.    Rogers said that he did not count the money.

181.    Rogers told detectives that he brought the money with him so he could spend it in California.

**Criminal History**

182.    When asked if he had ever been arrested, Rogers stated that he had been arrested for using drugs.

183.    Rogers was arrested on February 6, 1998 in Indiana for Possession of a Controlled Substance (Cocaine).

184.    He was also arrested on April 1, 1998 in Indiana for Possession with Intent to Distribute Cocaine Base.

185.    He pled guilty to the charge.

186.    After a full count of the currency, it was determined that Rogers was carrying $15,070.00.

187. The $15,070.00 was in the following denominations:

| Number of Bills | Denomination of Bills | Total Amount Per Bill Denomination |
|---|---:|---:|
| 15 | $100.00 | $1,500.00 |
| 4 | $50.00 | $200.00 |
| 650 | $20.00 | $13,000.00 |
| 37 | $10.00 | $370.00 |
| **TOTAL** | | **$15,070.00** |

188. The money seized from both Dudley and Rogers was subjected to a canine sniff by a certified narcotic canine. The canine did not alert.

189. Based upon their training and experience, Detectives Oolman and Blalock know that it is common for money couriers to separate drug money between them so as not to have all of their money seized when stopped by law enforcement officials.

190. It is also common for money couriers to not know the amount of currency that they are carrying because it is not their money.

191. Detectives know from their training and experience that couriers of currency travel from drug demand locations, such as Indiana, with cash to geographical locations which supply illegal drugs, such as California.

192. They also know that couriers book one way tickets at the last moment before travel in an effort to minimize the possibility law enforcement will discover the travel plans and monitor them.

193. Because of the large revenue generated by trafficking in illegal drugs, no attempt is made by couriers to save money by making travel plans more than two weeks in advance.

194. Detectives know that round-trip tickets are virtually never used by couriers, even thought they are more economical, due to the increase in risk associated with creating a record of the limited stay in the source city and risk that the return travel may be monitored by law enforcement.

195. Couriers travel for the express purpose of exchanging currency for illegal drugs at the source destination and return in a short period of time.

196. Couriers often have a cover story which justifies large amounts of currency and reasons for a short stay, but in reality make no sense.

197. Couriers often give conflicting stories to law enforcement.

**FIRST CLAIM FOR RELIEF**

198. Plaintiff repeats and realleges each and every allegation set forth in paragraph 1 through 197, above. Based on the aforementioned facts and circumstances, because the defendant currency constitutes or is derived from proceeds traceable to a violation of, or conspiracy to commit a violation of, 21 U.S.C. § 841 and/or §846, which are offenses constituting "specified unlawful activity" under 18 U.S.C. § 1596(c)(7), it is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

**SECOND CLAIM FOR RELIEF**

199. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 198, above. Based on the aforementioned facts and circumstances, the defendant currency was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* It is, therefore, subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

///

///

///

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the defendant; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

RESPECTFULLY SUBMITTED this 6th day of November, 2009.

DENNIS K. BURKE
United States Attorney
District of Arizona

S/ Jennifer Levinson

JENNIFER LEVINSON
Assistant United States Attorney